## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

TRUE RETURN SYSTEMS LLC,

               Plaintiff,

    vs.

COMPOUND PROTOCOL,

               Defendant.

Case No. 1:22-cv-8483

DEMAND FOR JURY TRIAL

## COMPLAINT FOR PATENT INFRINGEMENT

1.     True Return Systems LLC ("True Return" or "Plaintiff"), by and through its counsel, hereby brings this action for patent infringement against Compound Protocol ("Compound" or "Defendant"), a decentralized autonomous organization, alleging infringement of U.S. Patent No. 10,025,797 (the "Patent-in-Suit" or the "'797 Patent"), titled "METHOD AND SYSTEM FOR SEPARATING STORAGE AND PROCESS OF A COMPUTERIZED LEDGER FOR IMPROVED FUNCTION," a copy of which is attached as Exhibit 1.

## NATURE OF THE ACTION

2.     This is an action for patent infringement arising under the United States Patent Act 35 U.S.C. §§ 101 et seq., including 35 U.S.C. § 271.

## PARTIES

3.     True Return is limited liability company organized and existing under the laws of the state of Connecticut with its principal place of business located at 253 Turtle Back Road, New Canaan, CT 06840.

4.      Upon information and belief, Compound is a decentralized autonomous organization controlled and operating at the Ethereum blockchain contract address 0xc00e94cb662c3520282e6f5717214004a7f26888   and   operating   from   the   website https://compound.finance/. Compound's governance and administration are run through the Compound forum website https://www.comp.xyz/.

5.      On information and belief, in January 2018, Robert Leshner introduced the Protocol and the name "Compound" in an online blog post on Medium, and informed readers that Compound was in the process of developing the Protocol.

6.      In the context of Compound, a protocol is comprised of groups of voting and governing owners, software coders, and system administrators who collectively deploy and maintain software and devices which operate on, or are connected to, a blockchain. While at any moment in time, protocols such as Compound operate autonomously, modify the ownership records of one of more blockchains, and teams are relied upon to monitor and regularly modify a protocol's components.

7.      As a protocol, Compound records entries on one or more blockchains in the process of providing its cryptocurrency financial services. A blockchain, such as the Ethereum blockchain or the Bitcoin blockchain, is a distributed file system for the purpose of recording transactions and ownership of one or more tokens or coins, where the blockchain itself is maintained as a complete record of transaction records accessible in the public domain, and where transaction records are immutable.

8.      The Blockchain counsel describes Compound as "…the leading lending protocol…", where "…users can access a native token called COMP, which can be earned by lending or borrowing assets" and where "With the Compound Governance Dashboard, COMP

helps with the governance of essential protocol decisions, with flexibility in voting and delegation." *See* Blockchain Council, "DeFi Protocols: A Complete Overview," Ayushi Abrol, https://www.blockchain-council.org/defi/defi-protocols/.

9.     On information and belief, in September 2018, Compound [Labs] deployed the Protocol to the Ethereum mainnet.

10.    Compound was launched for the principal purposes of creating a cryptocurrency lending business and marketplace governed by the owners of the COMP token and Compound Labs Inc. (as Compound's initial administrator and software provider). The ownership and governance rights of Compound are based on COMP tokens created and distributed by Compound; Compound Labs, Inc. and Robert Leshner have been holders of COMP tokens. Compound Labs, Inc. lists an address of 3001 19th Street Suite 200, San Francisco, CA 94110 but on information and belief, Compound (the Protocol) operates, by design, without a U.S. address or location and Compound Labs Inc. represents that it has turned over administration and control of Compound to the holders of Compound's COMP token. *See* "The Compound Protocol Belongs to the Community," Compound Blog at Medium.com, Jake Chervinsky, General Counsel, June 16, 2020 https://medium.com/compound-finance/compound-community-ownership-ee0ed1252cc3.

11.    Investment tokens in Compound are freely tradable in the U.S. on the largest cryptocurrency exchanges including Coinbase, Gemini, and Kraken. Similarly, access to Compound's borrowing and lending technology services is available throughout the U.S. Compound operates as a cryptocurrency financial services business through its website address (https://compound.finance/) and through its addresses on the Ethereum blockchain network. Compound's financial services business is a cryptocurrency banking, lending, and trading business which operates through Ethereum contract addresses, computer hardware systems, and software.

Compound's primary financial service activity is the borrowing and lending of approximately 20 unique cryptocurrencies. Both individual and institutional customers access Compound's crypto banking service by connecting to one of Compound's Ethereum blockchain addresses and by accessing the Compound website.

12.     On information and belief, Compound operates as a decentralized autonomous organization (a "DAO") and Compound is not formally organized as a corporation, LLC, partnership, or other recognized organization type which would serve to limit the liability of its COMP token owners.

13.     In a DAO, there is generally no formal corporate structure, no explicit liability protection, and no distinction between managers and directors, or between general and limited partners. Instead, holders of specific tokens, such as the COMP, have governance rights that allow holders to propose and approve actions that Compound will take. Actions include many of those typically done by corporate officers, boards, or employees, such as spending treasury funds to hire people; changing organizational goals and policies; and even distributing treasury assets to COMP token holders, like how corporations can authorize dividends or other distributions of profits. Holders of governance tokens thus may participate in the governance of a protocol, have a potential claim on its profits, and they share responsibility for its liabilities.

## JURISDICTION AND VENUE

14.     This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1 et seq.

15.     This Court has exclusive subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). This Court has personal jurisdiction over Defendant because it has engaged in systematic and continuous business activities in this District. As described below, Defendant has committed acts of patent infringement giving rise to this action within this District.

16.     The Court has personal jurisdiction over Defendant for the following reasons: (1) Defendant is present within or has minimum contacts within the State of New York and the Southern District of New York; (2) Defendant has purposefully availed itself of the privileges of conducting business in the State of New York and in this district; (3) Defendant has sought protection and benefit from the laws of the State of New York; (4) Defendant regularly conducts business within the State of New York and within this district, and Plaintiff's cause of action arises directly from Defendant's business contacts and other activities in the State of New York and in this district; and (5) Defendant has purposely availed itself of the privileges and benefits of the laws of the State of New York.

17.     Defendant, directly and/or through intermediaries, distributes, uses, offers for sale, sells, and/or advertises products and services in the United States, the State of New York, and the Southern District of New York including but not limited to the products which contain the infringing elements as detailed below. Upon information and belief, Defendant has committed patent infringement in the State of New York and in this district; Defendant solicits and has solicited customers in the State of New York and in this district; and Defendant has paying

customers who are residents of the State of New York and this district and who each use and have used the Defendant's products and services in the State of New York and in this district.

18.    Venue is proper in this District under 28 U.S.C. § 1400(b), because Defendant has committed acts of patent infringement in this District. In addition, True Return has suffered harm in this District.

## TRUE RETURN AND THE '797 PATENT

19.    True Return was founded by Jack Fonss.

20.    Mr. Fonss is a technology consultant focusing on financial technology (FinTech) platforms and offerings. After college, Mr. Fonss was a computer programmer and systems analyst at both McKinsey & Company and Morgan Stanley & Co on a range of platforms, operating systems, and computer languages. He has consulted for numerous asset managers and technology companies on a wide variety of FinTech issues related to funds, trading systems, and digital currencies.

21.    Mr. Fonss founded and managed AccuShares Investment Management, LLC ("AccuShares"), a FinTech startup offering innovative technological solutions to problems limiting exchange traded funds. While running AccuShares, Mr. Fonss was the principal inventor of a range of systems and software technologies which have been adopted by many crypto-currency, digital money, and exchange middleware environments.

22.    By 2015, Mr. Fonss recognized that distributed computerized ledger technology (including blockchain technology) provided the potential to improve computer system environments and their interaction with real-world assets and electronically published data sources. In particular, Mr. Fonss' work included the design and integration of separate linked ledgers and architectures for computer system efficiency, security and persistent auditability.

23.     Mr. Fonss worked through the issues and invented distributed computerized ledger technologies that could, among other applications, efficiently integrate on-chain and off-chain data and processes for improved computer system efficiency and security. He filed a provisional patent application for his invention with the U.S. Patent and Trademark Office on February 23, 2018. and a non-provisional patent application on March 16, 2018.

24.     On July 17, 2018, the U.S. Patent and Trademark Office duly and legally issued U.S. Patent No. 10,025,797 (the "'797 Patent"), naming Jack Fonss as the inventor. The '797 Patent is entitled "Method and System for Separating Storage and Process of a Computerized Ledger for Improved Function." A true and correct copy of the '797 Patent is attached hereto as Exhibit 1.

25.     The '797 Patent is generally directed to systems and methods that improve distributed-ledger technology by addressing computational, time, storage, and security constraints inherent to distributed ledgers (such as blockchains). The general approach of the '797 Patent is to separate certain processing and storage functions from a base distributed computerized ledger (such as a blockchain) but link such separated processing and storage to the base distributed computerized ledger.



FIG. 18

26.     The systems and methods of the '797 Patent can be generally understood with reference to the exemplary embodiment depicted in Figure 18 of the '797 Patent, which is reproduced in annotated form below.

27.     An exemplary differentials processing/storage system (in green) includes a differentials computer node (item 191) and a differential storage unit (item 188) linked to one or more electronically published time-sequenced data streams or descriptive differentials (items 183, 184, 185, in orange). The system processes (187) data from the data stream / descriptive differentials (183, 184, 185) and stores the processed data on the differential storage unit (188). For example, the system may process logistical data provided by a shipping network, financial data and market prices provided by an exchange, or information provided by a news outlet.

28.     The differentials processing/storage system (in green) is also linked to a base distributed computer ledger ("DCL," 181, in cyan) that includes one or more transaction records.

The system processes (187, 190, 191) differential data (188) to link the differential data (188) to the DCL, which can then, e.g., update a transaction record of the DCL (181) according to the differential data (188).

29.    This system improves over the prior-art distributed computerized ledgers in a number of ways including moving certain functionality and storage off the DCL while simultaneously allowing the DCL to utilize exogenous data to update transaction records on the DCL. This is possible because the differentials processing/storage system links the DCL to the exogenous data while keeping and implementing certain computing-intense processes and storage-intense data so that the DCL is not burdened with such. This provides several technological advantages. For instance, processing and storage constraints inherent to a DCL are overcome by shifting certain processing and storage to a differentials processing/storage system. Similarly, security issues related to exposing DCL processes to the public are ameliorated by shifting processes to the differentials processing/storage node. Through a layered or parallel architecture, system access, processing, and storage can be performed more efficiently, and distributed ledgers such as blockchains can realize increased functionality.

30.    The '797 Patent is valid and enforceable.

31.    The '797 Patent is directed to patentable subject matter.

32.    True Return is the assignee of all right, title and interest in the '797 Patent including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the '797 Patent. Accordingly, True Return possesses the exclusive right and standing to prosecute the present action for infringement of the '797 Patent by Defendant.

**<u>COMPOUND</u>**

33.     Compound provides methods and systems that use a processing/storage system to link published data to a distributed computerized ledger, specifically a blockchain.

34.     Compound establishes the Compound blockchain data environment which includes the Compound Protocol and related system components; on belief and information, the system components and integrations of Compound were provided by and performed by Compound Labs Inc. The Compound blockchain data environment creates and manages the cTokens (an Ethereum compliant representation of balances supplied to Compound) and COMP (ownership and governance) interests.

35.     Compound is a self-described "algorithmic, autonomous interest rate protocol" which operates as a decentralized autonomous organization for the benefit COMP token owners. Between amendments, enhancements, and modifications by its owners, Compound operates autonomously, carrying out the business of creating and maintaining its cToken balances, and running its decentralized cryptocurrency borrowing and lending ecosystem for the benefit and profit of the COMP token owners. Compound has been periodically controlled by an administrator account which was originally operated by Compound Labs Inc. The administrator's centralized control is subject to a timelock delay to promote Compound's autonomous character.

36.     Similar to traditional partnership arrangements, Compound's governance and voting are highly concentrated among a small number of blockchain identities. In three recent governance matters reported on the Compound Governance Overview portal (https://compound.finance/governance), "Return Accidentally Send Funds #3", "OpenZeppelin Security Partnership – 2022 Q3 Adjustment", and "Risk Parameter Updates for MKR and AAVE", 10 or fewer individual blockchain identities cast between 80% to 99% of the total votes.

37.     Similar to conventional businesses and investment arrangements, Compound and the holders of the COMP token rely on the stewardship and efforts of specific individuals, formal teams, centralized groups, and hired subcontractors to operate, maintain, safeguard, and improve Compound. For example, Compound has had a designated team of six individuals who are relied on to halt, restart, or otherwise secure Compound's proper and safe operation. In the Compound forum post titled "Community Multisig (4-of-6) Deployment" (https://www.comp.xyz/t/community-multisig-4-of-6-deployment/134), Compound announces and designates a team of six who comprise the protocol's multiple signature security management, where any 4 of the designated 6 may halt or otherwise directly control the protocol's operation. Within the post, the designated team accepts their multisig appointments. The post includes: "In a community-driven effort with stewardship from @arr00, a Community Multisig 82 has been deployed that can, through the governance process, be voted into usage by the protocol for a variety of purposes: for example, to act as Pause Guardian; or in the future, to act as Borrow Limit Guardian. Six community members have been proposed as signers in a 4-of-6 multisig…"

38.     The COMP token is the currency for the ownership, operation, and governance of the Compound blockchain integrated system. Compound ownership and governance, through the COMP token, is based on collective management and decision making by the business owners, where owners collectively submit proposals, and owners vote on proposals in proportion to their proportional investment in COMP ownership tokens.

39.     As of quarter end March 31, 2022, Compound maintains approximately 10,000,000 COMP tokens for the purposes of owning, funding, governing, and promoting Compound's cryptocurrency banking. The current market value of COMP ownership tokens was approximately $986,000,000 as of March 31, 2022.

40.     Compound and Compound Labs Inc. develop and promote the Compound blockchain environment to individuals and institutions in the U.S. in large part to expand the use and adoption of the COMP token and thereby increase the value of the COMP token. COMP is widely regarded as a cryptocurrency investment asset, and a number of pooled investment funds have registered funds with the U.S. Securities and Exchange Commission for investors to gain access to COMP and its expected returns from price appreciation.

41.     Compound's main net launch was in September 2018, and Compound was upgraded to a version 2 in May 2019. Prior to May 2020, Compound's protocol balances remained below $500 million. Since June 2020, Compound's balances have generally exceeded $500 million. As of the first quarter of 2022, Compound balances regularly exceed $10 billion.

## COMPOUND SYSTEM

42.     Compound authored and published a whitepaper titled "Compound: The Money Market Protocol" ("Compound Whitepaper"). A true and correct copy of this publication is attached hereto as Exhibit 2.

43.     In the Compound Whitepaper, Compound states: "Governance: Compound will begin with centralized control of the protocol (such as choosing the interest rate)".

44.      In the Compound Whitepaper, Compound states: "The [interest rate] demand curve is codified through governance …governance will begin with centralized control"

45.     In the Compound Whitepaper, Compound states: "the history of each interest rate, for each money market, is captured by an Interest Rate Index, which is calculated each time an interest rate changes…."

46.     In the Compound Whitepaper, Compound states: "assets supplied to a market are represented by an ERC-20 token balance ("cToken") which entitles the owner to an increasing quantity of the underlying asset"

47.     In the Compound Whitepaper, Compound states: "Each money market is unique to an Ethereum asset (such as Ether, an ERC-20 stable coin) . . . and contains a transparent and publicly-inspectable ledger with a record of all transactions . . . ."

48.     In the Compound Whitepaper, Compound states: "A Price Oracle maintains the current exchange rate of each supported asset…pools prices from the top 10 exchanges…used to determine a borrowing capacity and collateral requirements . . . ."

49.     In the Compound Whitepaper, Compound states: "Compound money markets are defined by an interest rate, applied to all borrowers uniformly which adjust over time…"

50.     In the Compound Whitepaper, Compound states: "…as the market earns interest, its cToken becomes convertible into an increasing quantity of the underlying asset"

51.     Compound authored and published an article titled "The Open Oracle System". A true and correct copy of this publication is attached hereto as Exhibit 3.

52.     In the Open Oracle System, Compound states: "The Compound protocol currently relies on a price feed, maintained by our team, to determine each user's borrowing capacity and to measure liquidation thresholds."

53.     Compound authored and published an article titled "Compound API Introduction". A true and correct copy of this publication is attached hereto as Exhibit 4.

54.     In the Compound API Introduction, Compound states: "The market history service retrieves historical information about a market. You can use this API to find out the values of

interest rates at a certain point in time. It's especially useful for making charts and graphs of the time-series values."

55.     In the Compound API Introduction, Compound states: "Returns 10 buckets of market data" and "fetch(https://api.compound.finance/api/v2/market_history...".

56.     In the Compound API Introduction, Compound states: "The market history graph API returns information about a market between two timestamps."

57.     In the Compound API Introduction, Compound states: "The market history graph API response contains the rates for both suppliers and borrowers, as well as the sequence of total supply and borrows for the given market."

58.     Compound authored and published an article titled "Open Price Feed". A true and correct copy of this publication is attached hereto as Exhibit 5.

59.     In the Open Price Feed, Compound states: "If valid, the UniswapAnchoredView is updated with the asset's price. If invalid, the price data is not stored."

60.     In the Open Price Feed, Compound states: "UniswapAnchoredView only stores prices that are within an acceptable bound of the Uniswap time-weighted average price and are signed by a reporter. Also contains logic that upscales the posted prices into the format that Compound's Comptroller expects."

61.     In the Open Price Feed, Compound states: "The Open Price Feed accounts price data for the Compound protocol. The protocol's Comptroller contract uses it as a source of truth for prices."

62.     In the Open Price Feed, Compound states: "The Compound Protocol uses a View contract ("Price Feed") which verifies that reported prices fall within an acceptable bound of the

time-weighted average price of the token/ETH pair on Uniswap v2, a sanity check referred to as the Anchor price."

63.     In the Open Price Feed, Compound states: "Anchor Period - Get the anchor period, the minimum amount of time in seconds over which to take the time-weighted average price from Uniswap."

64.     In the Open Price Feed, Compound states: "Anchor Bounds: Get the highest and lowest ratio of the reported price to the anchor price that will still trigger the price to be updated. Given in 18 decimals of precision."

65.     Compound authored and published FAQ (frequently asked questions) on its website titled "Compound FAQ". A true and correct copy of this publication is attached hereto as Exhibit 6.

66.     In the Compound FAQ, Compound states: "When you supply assets to the Compound protocol, your balance is represented as a cToken, which can be transferred, traded, or programmed by developers to create new experiences. Think a cToken like a receipt [sic] — it's used to show who owns a balance inside Compound."

67.     In the Compound FAQ, Compound states: "In each market, interest rates are determined algorithmically (based on supply and demand), and interest accrues every Ethereum block."

68.     In the Compound FAQ, Compound states: "Compound is managed by a decentralized community of COMP token-holders and their delegates, who propose and vote on upgrades to the protocol."

69.     Compound authored and published a codebase post titled "compound-finance/open-oracle". A true and correct copy of this publication is attached hereto as Exhibit 7.

70.     In the codebase post open-oracle, Compound states: "The Open Price Feed accounts price data for the Compound protocol. The protocol's Comptroller contract uses it as a source of truth for prices. Prices are updated by Chainlink Price Feeds. The codebase is hosted on GitHub, and maintained by the community."

71.     In the codebase post open-oracle, Compound states: "The Open Oracle is a standard and SDK allowing reporters to sign key-value pairs (e.g., a price feed) that interested users can post to the blockchain. The system has a built-in view system that allows clients to easily share data and build aggregates (e.g., the median price from several sources)."

72.     Compound authored and published a documentation titled "cTokens Introduction". A true and correct copy of this publication is attached hereto as Exhibit 8.

73.     In cTokens Introduction, Compound states: "Each asset supported by the Compound Protocol is integrated through a cToken contract, which is an EIP-20 compliant representation of balances supplied to the protocol. By minting cTokens, users (1) earn interest through the cToken's exchange rate, which increases in value relative to the underlying asset, and (2) gain the ability to use cTokens as collateral."

74.     In cTokens Introduction, Compound states: "cTokens are the primary means of interacting with the Compound Protocol; when a user mints, redeems, borrows, repays a borrow, liquidates a borrow, or transfers cTokens, she will do so using the cToken contract. There are currently two types of cTokens: CErc20 and CEther. Though both types expose the EIP-20 interface, CErc20 wraps an underlying ERC-20 asset, while CEther simply wraps Ether itself."

75.     Compound authored and published a documentation titled "Comptroller Introduction". A true and correct copy of this publication is attached hereto as Exhibit 9.

76.     In Comptroller Introduction, Compound states: "The Comptroller is the risk management layer of the Compound protocol; it determines how much collateral a user is required to maintain, and whether (and by how much) a user can be liquidated. Each time a user interacts with a cToken, the Comptroller is asked to approve or deny the transaction."

77.     In Comptroller Introduction, Compound states: "The Comptroller maps user balances to prices (via the Price Oracle) to risk weights (called Collateral Factors) to make its determinations. Users explicitly list which assets they would like included in their risk scoring"

78.     Compound authored and published an article titled "Supplying Assets to the Compound Protocol". A true and correct copy of this publication is attached hereto as Exhibit 10.

79.     In Supplying Assets to the Compound Protocol, Compound states: "When users and applications supply an asset to the Compound Protocol, they begin earning a variable interest rate instantly. Interest accrues every Ethereum block (currently ~13 seconds), and users can withdraw their principal plus interest anytime."

80.     In Supplying Assets to the Compound Protocol, Compound states:" Supplying Ether (ETH) to the Compound Protocol is as easy as calling the "mint" function in the Compound cEther smart contract. The "mint" function transfers ETH to the Compound contract address, and mints cETH tokens. The cETH tokens are transferred to the wallet of the supplier."

81.     In Supplying Assets to the Compound Protocol, Compound states: "Remember that the amount of ETH that can be exchanged for cETH increases every Ethereum block, which is about every 13 seconds. There is no minimum or maximum amount of time that suppliers need to keep their asset in the protocol. See the varying exchange rate for each cToken by clicking on one at https://compound.finance/markets."

82.     In Supplying Assets to the Compound Protocol, Compound states: "The Comptroller contract provides an easy-to-use function that calculates your account's liquidity, which is a USD-denominated value of the maximum allowed borrow amount. You should never borrow this much at once because your account would instantly be liquidated as soon as the protocol's "accrue interest" operation is executed."

83.     In Supplying Assets to the Compound Protocol, Compound states: "Before we borrow ETH, we need to determine the maximum amount of ETH we can borrow. This is important because if we try to borrow more than we are allowed to, the operation will fail. Also, if we borrow too close to the limit, our account will be liquidated. This is done by calling the getAccountLiquidity function on the protocol's comptroller contract."

**FIRST CLAIM FOR RELIEF**
**(Infringement of U.S. Patent No. 10,025,797)**

84.     True Return incorporates by reference its allegations in the preceding paragraphs of this Complaint.

85.     **Direct Infringement.** Defendant has been and continues to directly infringe one or more claims of the '797 Patent in at least this District by making, using, offering to sell, selling and/or importing, without limitation, at least the products identified in the charts incorporated into this Count below (among the "Exemplary Defendant Products") that infringe at least the exemplary claims of the '797 Patent also identified in the charts incorporated into this Count below (the "Exemplary '797 Patent Claims") literally or by the doctrine of equivalents. On information and belief, numerous other devices that infringe the claims of the '797 Patent have been made, used, sold, imported, and offered for sale by Defendant and/or its customers.

86.     Defendant also has and continues to directly infringe, literally or under the doctrine of equivalents, the Exemplary '797 Patent Claims, by having its employees internally test and use these Exemplary Products.

87.     Defendant has had knowledge and notice of the '797 Patent, as well as of its own infringement of the '797 Patent, at least since the date of the filing of the present Complaint.

88.     Despite such actual knowledge, Defendant continues to make, use, test, sell, offer for sale, market, and/or import into the United States, products that infringe the '797 Patent. On information and belief, Defendant has also continued to sell the Exemplary Defendant Products and distribute product literature and website materials inducing end users and others to use its products in the customary and intended manner that infringes the '797 Patent. Thus, on information and belief, Defendant is contributing to and/or inducing the infringement of the '797 Patent.

89.     On information and belief, Defendant's infringement of the '797 Patent has been and continues to be willful.

90.     Defendant's infringement of the '797 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285, for which True Return is entitled to enhanced damages.

91.     **Induced Infringement.** Defendant actively, knowingly, and intentionally has been and continues to induce infringement of the '797 Patent, literally or by the doctrine of equivalents, by selling Exemplary Defendant Products to its customers for use in end- user products in a manner that infringes one or more claims of the '797 Patent.

92.     **Contributory Infringement.** Defendant actively, knowingly, and intentionally has been and continues materially contribute to their own customers' infringement of the '797 Patent, literally or by the doctrine of equivalents, by selling Exemplary Defendant Products to their customers for use in end-user products in a manner that infringes one or more claims of the '797

Patent. Moreover, the Exemplary Defendant Products are not a staple article of commerce suitable for substantial non-infringing use.

93.     Exhibit 11 includes charts comparing the Exemplary '797 Patent Claims to the Exemplary Defendant Products. As set forth in these charts, the Exemplary Defendant Products practice the technology claimed by the '797 Patent. Accordingly, the Exemplary Defendant Products incorporated in these charts satisfy all elements of the Exemplary '797 Patent Claims.

94.     True Return therefore incorporates by reference in its allegations herein the claim charts of Exhibit 11.

95.     True Return is entitled to recover damages adequate to compensate for Defendant's infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendant, together with interest and costs as fixed by the Court.

## JURY DEMAND

96.     Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, True Return respectfully prays for judgment as follows:

A.     a judgment in favor of True Return that Compound has infringed, literally or under the doctrine of equivalents, U.S. Patent No. 10,025,797;

B.     a judgment and order finding that Compound's infringement has been willful;

C.     a judgment and order requiring Compound to pay True Return its damages, costs, expenses, prejudgment interest, post-judgment interest, and enhanced damages for Compound's infringement, and to provide an accounting of ongoing post-judgment infringement;

D.      a judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding True Return its reasonable attorneys' fees against Compound;

E.      an order preliminarily enjoining Compound from making, using, selling, or offering for sale the claimed subject matter of U.S. Patent No. 10,025,797;

F.      an order permanently enjoining Compound from making, using, selling, or offering for sale the claimed subject matter of U.S. Patent No. 10,025,797, or such other equitable relief the Court deems warranted; and

G.      any and all other relief any and all other relief as the Court may deem appropriate and just under the circumstances.

Dated: October 5, 2022                          Respectfully submitted,

                                                By: _____

                                                David A. Boag
                                                BOAG LAW, PLLC
                                                447 Broadway, Suite 2-270
                                                New York, NY 10013
                                                (212) 203-6651
                                                dab@boagip.com

                                                Attorneys for Plaintiff True Return Systems LLC